Good morning, everyone. We have four cases on the calendar today. Three are being argued. One is on submission. I've been advised by our courtroom deputy that everyone is here either on Zoom or in person who is arguing today, so we will dispense with the calling of the calendar, and we'll proceed to the argument on the first case, which is United States v. Pineda. And just a reminder for the attorneys, when you come up to the podium, if you would like to, you can take your mask off. It's up to you. But just please, when you return to your seat, just put your mask back on. All right? Thank you. All right, so we have Ms. Aldea for the appellant, who is reserved two minutes for rebuttal. Good morning, Your Honors. May it please the Court, my name is Donna Aldea, and along with Matthew Keller, we represent the defendant appellant, Mr. Lee. Your Honor, this case, simply at its core, is a case that presents the question of when is a translator merely a translator? In this case, the evidence before the Court showed that Mr. Lee was acting purely as a translator when he was present at two meetings that basically gave rise to the Hobbs Act charges in this case. Now, in terms of determining what his role actually was, I think the first thing that is striking is that when one tries to actually find the summary of these other cases that have dealt with it, there is a dearth of case law dealing with cases like Mr. Lee's where you really have an interpreter who is interpreting. But Ms. Aldea, isn't one of the key things whether or not the interpreter was adding his own statements during the course of the two meetings? Isn't that a key factor in determining whether someone was a quote-unquote mere interpreter or wanted the extortionate plan to succeed? Well, Your Honor, I think the content of those statements is critical to determining whether the person was a mere interpreter. All right, well, let's go through them. On the first meeting, a gun is displayed by Mr. Pineda in the course of trying to get the victim to pay the money. The victim refuses to pay, and your client says, Tony, give it to him. You don't need all that unnecessary problems in the interpreting anything there. He's encouraging the victim to pay the money after a gun has been displayed. So why can't, we have to draw all the inferences in the government's favor. You know, this was obviously argued to the jury. Why couldn't a jury rationally conclude that your client was not indifferent in just interpreting, but wanted the extortionate plan to succeed? So there are two answers to that question relating to that meeting. The first is that when we talk about the threat of force and we rely on the gun for that, one of the things that's crucial is showing that Mr. Lee, in fact, had knowledge of the gun. In this case, Mr. Lee was called into the meeting after the meeting had started to interpret. He wasn't there from the get-go. There was no evidence that the government proffered that- Are you saying he didn't know that the gun was displayed? Well, there's no evidence that he knew that the gun was displayed, actually, because there was- Well, the gun was displayed at a meeting in which he was interpreting. Correct. And you're saying there's no evidence one way or the other? Yes, so the reason- He was in favor of the gun. Well, but the reason for that is he had no advanced knowledge that Pineda was armed, is the first thing that I was saying. So in terms of the use or the threatened use of force- That's not critical. When the gun is displayed and he testified they were four feet away, okay, so, again, a rational inference is that he saw the gun. Well, it was- Let me finish. And then after that, so whether he knew the gun before the meeting or not, okay, we'll just assume he didn't know. The gun is displayed, and again, rather than either leave or merely interpret, he then tells the victim, pay the money. And then shows up at the second meeting after the first meeting, having known, obviously, that a gun was displayed at the first meeting. So what's your response to that? So my response, again, focusing on the gun. So when the gun is displayed, the reason I say that there's no evidence that he actually saw it is because of the circumstances in which it was described that it was displayed. The government characterizes this as a gunpoint extortion. The gun was never pointed at anybody. In fact, what- What difference does that make? Because the way that- Showing the gun. The way that it was initially described is that Pineda transferred the gun from his waistband from the rear to the front. Which doesn't make it clear that somebody, depending on where they are in that room, would actually see it. But even assuming that he saw it, even assuming that he saw the gun, that there was no evidence of that. His actions did not give rise to an inference that he tried to escalate it or rely on the gun as saying, you're going to get in trouble, you're going to get hurt. He tried to minimize the- If person A, Pineda here, goes to his interpreter and says, I'm going to extort. I'm going to put pressure on him. I need an interpreter. You don't have to do anything. I just want you to interpret. Is that okay? Your Honor- And the person goes and does nothing but interpret. Isn't that furthering the extortion? No, your honor, I don't think it is. In other words, every extortioner is entitled to an interpreter. Your honor, I don't think that's true. I don't think that's true. I think it's all very fact specific. So the reason that I started with looking at the case laws, when we look at the cases where, there are very few of them because most interpreters are not charged, is how I started. But the ones that do exist are actually telling because there's always a requirement or showing that the person do more than just be present and translate words. There has to be either a long standing relationship or an interest in the business venture. Or something to gain from the conspiracy, some personal gain. Or consciousness of guilt or something more. So the cases are instructive. In United States versus Lee, for instance, the interpreter in a conspiracy and operation of illegal massage parlors performed activities over an extended period of time. Demonstrating the Seventh Circuit's quote, that he was intimately involved in the entire massage enterprising. He did remodeling for the spas, he got permits, he helped masseuses, he sent money orders. He picked them up at airports, he put ads in the paper, he put his name near the credit card machine, he had money in a safe. You look at United States versus Malley, same thing. In addition to serving as translator, he transported drugs. The two people had a prior relationship, albeit different. It didn't have to do with keeping the business. There is no relationship in any of the cases that is as minimal as this one. According- But why would it matter if it establishes a relationship of trust between the two? But there was no relationship of trust. They had known each other, according to the government's proof, for less than two months at the time that this happened. The proof was he was buying drugs from him, he was gambling in his gambling parlor, so- He was gambling in Tony's gambling parlor as well, with equal frequency. And he translated just as much for Tony, who demanded at the meetings that he translate his words, as he did for Pineda. I want to focus on the second meeting, because the second meeting, there seemed to be even more statements by our client that are completely independent of any translation. He reminded him of this story about bread and soda during that meeting, when the victim wants to know whether he's going to have to pay money on top of the money they're already demanding. He says, no, you're not going to have to do that without any translation from Mr. Pineda. And he also talked about how they were going to check how much he was making, that they're going to have to check his meters, I think was the term. So again, these are all, you cite these other cases, but that's not the minimal amount necessary to find someone is knowingly joining in the conspiracy. It's whether or not they're doing things that a jury could rationally infer means that they wanted the venture to succeed. And those statements- There's a difference between, and this is the conflation that I think the district court did here that is improper. There's a difference between wanting the venture to succeed the way Mr. Lee did. In other words, trying to convince Pineda, I'm sorry, Tony, peacefully to coexist with Pineda and to agree because of a matter of respect. Or because of a matter of mutual respect, or because of the way the business dealings were going on or transpiring, to agree to give him a share of the business he had opened right above Pineda's and wanting to extort him with threats of violence. Mr. Lee never made a threat of violence. And context matters because everything that he said to translate where he diverged from the words. First of all, he wasn't a professional translator. And actually, during the meeting itself on the tape, he expresses discomfort at translating when there's so many people speaking and he doesn't feel he can do a good job of it. He was translating the gist. But every time an issue came up relating to why it is that Tony should give the money, what he did is he downplayed, he made it more a matter of respect, a more of matter of mutual cooperation, a more of matter of this is the right thing to do. Perhaps that the victim would agree to the ultimate purpose of the meeting, which was backed up by extortion. I mean, it was kind of a good cop, bad cop situation. He wanted to further the objective, the same objective as Pineda, just doing it a slightly different way. Except if the crime, it's not a crime to convince someone who opens a shop above yours under the pretext that it's going to be a massage parlor when it's actually the same business that you're running, albeit an illegal business. It's not a crime to convince that person, well, under these circumstances, you should give me a share. What is a crime is to threaten violence. And what Mr. Lee never did is he never threatened violence. And again, the case law is instructive because there is no case where there is so minimal a relationship and so minimal an involvement. It truly is a case where Mr. Lee was brought in after the fact at both meetings to translate what was being said mutually for both men. His relationship with Tony was not much different than his relationship with Pineda. He had gambled in both places before. Presumably he had gambled at Tony's for a longer period of time because that establishment was longer. He had only been at Pineda's for a couple of months. He came in two or three times a week and his relationship with Pineda was really, it was, he was not involved, all of the testimony made clear, the district court made clear, he was not involved in the enterprise. All right. We understand your position, you have two minutes for rebuttal. Thank you, Your Honor. Okay, we have from the government. Good morning, and may it please the court. My name is Lindsay Oken. I'm an assistant United States attorney in the Eastern District of New York. And I represent the government in this appeal from the defendant's November 2019 conviction on two of the four charges in this case. On appeal, the defendant- There's no conspiracy and substantive extortion, right? There is an extortion conspiracy charge as well as aiding and abetting the threatening physical violence in furtherance of the plan to extort. Yes, Your Honor. In this appeal, the defendant essentially asks this court to reweigh the evidence presented at trial and to draw inferences from that evidence in the defendant's favor. Even if those inferences were reasonable, and many of them are not, those inferences were considered and rejected by a rational jury. As this court knows, the task of choosing among competing inferences is for the jury. And the defendant now asks this court to second guess each and every one of the jury's rational choices, which flips the standard of review on its head. Now the thrust of the defendant's argument on appeal is that the defendant functioned as a mere translator in this case. That argument was made repeatedly before the jury. It was made in the defendant's opening statement. It was made when cross-examining the victim. It was made in summation. It was made in the defendant's post-trial motions. And in fact, when in denying the defendant's post-trial motions, the district court ruled quote, as to Lee's attempt to characterize himself as an oblivious translator, this is belied by the evidence introduced at trial, which suggested that, quote, Lee was advocating for Panetta's position the entire time. That argument was again addressed by the court at sentencing when the district court explained that he understood the defendant's argument that, quote, he was a mere interpreter. I got that, but the jury thought otherwise, and there's testimony to support that. So I'm not going to retry the whole case. I saw the video, and I heard the testimony, and there is no question in my mind that your client was helping Panetta demand a monthly percentage of the victim's profits. That evidence, your honors, at trial included, among other things, extensive testimony from the extortion victim. That testimony was corroborated by a video and audio recording of the second extortion meeting. It included Ms. Young's testimony that again corroborated the victim's testimony that Panetta demanded 10% from the extortion victim. And it included phone records that showed telephone communications between Panetta and the defendant in this case. You heard Ms. Althaea's argument, her argument is to the extent he may have been advocating or adding statements, it was done with a motive to have peace, just to make sure that there wasn't going to be no violence, what's your response to that? Your honor, I think if a defendant goes into a convenience store and brandishes a gun and demands money from the register and says after that, but I just want you to do it because you respect me. A robbery has still occurred, and that's the same thing that's happening here. In particular, in the second meeting, there's a number of participants- Well, it's slightly different than that because it's a different person, right? Her argument is that maybe Mr. Panetta had that intent. He was the one with the gun. She's arguing her client made no threats and didn't share that view of Mr. Panetta. Is that plausible? I don't think so, your honor. I don't think that's supported by the record in this case. In particular, during the second meeting, and that's the one that's captured on video, there are four participants on sort of Panetta's side of things. And they're all trying different tactics in order to get the victim to make these extortion payments. Sometimes they're expressing exasperation and frustration that this issue is still ongoing. Sometimes they're trying to negotiate or reason with the victim. When you say they're trying different tactics to try to get the extortion payments, it isn't actually extortion unless the tactic that they're using is threat or fear, right? So if the group says, this is a bummer, this is unfair. We should talk to him and see if he's, we're all operating in the shadows here. These are all illegal businesses. Maybe we should talk to him and see if he'll give us 10%. That's not illegal, right? And aiding and abetting that or being a part of that conspiracy wouldn't be illegal. But I think, Your Honor, that's not exactly what happened here. So what happened here in context is there was a prior meeting the day before, where the testimony is that Panetta not only pulled a gun, but waved the gun in front of him. So do you agree that to have sufficient proof of defendant's state of mind, defendant has to have had an awareness of the pulling of the gun? I don't think so, Your Honor. I do think, to be clear, that the record really only supports one inference, that the defendant was aware of the gun. But I do think that there's other evidence of the defendant's intent here. And that's evidence of, not only was he at times translating Panetta's statements, and at times he was translating them, trying to do it sort of directly word for word. But there were other times where he was sort of selectively translating based on the defendant's own judgment of what he believed. Right, but again, since it's not illegal to try to ask somebody to give you money, you still have to get this defendant, not Panetta's, but this defendant's intent to do so by threat or fear. So if you don't have the gun in the mix, where else are you getting defendant's intent to promote a conspiracy that's predicated on threat or fear? Well, I think, Your Honor, even if we just look at this first meeting, where the defendant has translated Panetta's statement that they could be, quote, friends or enemies. And this is in a context of a victim who is well aware of Panetta's reputation for violence, of his reputation for having a hot temper. And he's communicating not only the statement that they could be friends or enemies, but he's also relaying his own statement in that meeting where he reaches towards the victim and he says, just give it to him. You want to avoid all of these unnecessary problems in the future. That's him communicating, you can do this the easy way or you can do this the hard way. And he's imploring that the victim do this the easy way without, I think the undertone is, threats of violence or actual violence. And so, I think with or without the gun, the evidence is sufficient. But to be clear, the evidence with respect to the gun, I don't think there's any reasonable inference that the defendant was unaware of it. There's four participants at this first meeting. The victim brings one individual, Jeffrey, with him. And Panetta is there standing directly next to the defendant. They're standing approximately four feet away from each other. And the testimony is that Panetta took out the gun, that he not only just displayed it, but he waved it in front of him. And if there was any doubt as to whether the defendant was aware of that gun, it's referenced three times during the second meeting. And it generates laughter when it's mentioned. It doesn't generate a response where the defendant says, I don't know anything about any gun. I don't want anything to do with a violent extortion. He goes along with the plan at every turn. And if the court has no further questions, we're happy to rest on our submissions. All right, thank you. I'm sorry, go ahead, Judge Walker. No, I have nothing. Okay. Ms. Aldea, you have two minutes in rebuttal. Yes. Your Honor, just a couple of responses to that, and then I'm going to tie in very briefly to the second point that kind of plays into it. The first is, with respect to the question of, I think what the government just said, what the prosecutor said is that the victim was well aware of Panetta's reputation. And that what the victim perceived the threats to be is relevant here. I agree with that. And so I'd like to point to the fact of what the victim, what the record shows, the victim said Lee's role was. He only testified that he viewed Lee as a passive translator. And when asked specifically by the district court to explain the difference between what Lee was doing at the meetings and what the court interpreter was doing at trial, Tony did not identify any difference in their roles as translators. Instead, he focused on differences in their skill levels. What he said is, with Lee, some of the words or some of the sentence, it was clear to me, some were not. As opposed to the translator who he understood. So I would like to look at Tony's perception of it, because he viewed Lee as a translator, and I think that's critical. The second thing with respect to the gun, and I don't want to spend too much time on this, but the government said that there is no inference from the record other than that this gun was waved around and was used as a threat. Well, that's not true, because the FBI agent, Agent Food, testified at this trial. And what he testified is that in his statement, a day after this gun was taken out at the meeting, Tony made a very different description of how the gun was moved. He did not testify that it was taken out and pointed and waved around. He testified that all Pineda did is take it out of his back and put it in his front. Very different. And the FBI agent- What did he testify at trial about? What did Tony say at trial? At trial, Tony testified differently, so this is months later. He testified that the gun was taken out of Pineda's front waistband, where it would have been visible to everyone, taken out and pointed and moved around. That's a credibility determination, right? Well, Your Honor, yes, but it's- The way it is. It is a credibility- You're not the first, but you have- Yes, but I'm just correcting the statement to say that there is no other inference in this record. You have an FBI agent testifying as to what was said in a critical juncture. The final point, Your Honor, is that when we look at the determination that was made by the district court, and specifically the laughter with the gun. I'm not going to detail all of it, but there were many misstatements by the district court as to what the record showed that are just refuted by the record. What's the standard of review on the sufficiency of the evidence? It's de novo, Your Honor. So why do we care whether the district court's analysis had misstatements if we have to do our own analysis anyway? Well, Your Honor, I'm just asking the court not to rely on that. The government stated or relied on the district court's findings in the Rule 29 motion. And one of the things that's critical is the district court had no less than six misstatements of fact in the decision on that motion, including what is clearly refuted by the record that the government just relied on. The laughter when the gun was mentioned three times at the meeting. Three times that gun was mentioned, and three times Mr. Lee was not the one laughing, although the district court said he was. You can see that on the video because Mr. Lee is actually speaking during the time when that laughter comes out. So there are all sorts of inferences that are being drawn to show Mr. Lee's intent that are based on facts that matter and that were misinterpreted by the district court. With the gun, another such fact is the putting of the hand. The district court said that it found that there was testimony that Tony testified that when the gun was drawn, Mr. Lee actually took his hand and placed it on Tony. That's an invasion of private space. That's a touching that is very threatening. But that's not what the testimony was. The testimony was he reached his hand out. We understand and as noted, it's state and local review, so. Okay, Your Honor. All right. Thank you. For reserved decision, thank you to both sides. Have a good day.